1  **Bernt Wahl (Defendant)**
2  P.O. Box 13991
3  Berkeley, CA 94712
4  (510) 647-9205
5  Representing Factle and self

☐ **ORIGINAL**

RECEIVED
FEB 1 2 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED
FEB 1 2 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7  UNITED STATES DISTRICT COURT
8  NORTHERN DISTRICT OF CALIFORNIA

11  MAPONICS, LLC,
12  a Vermont limited liability company,
13  DARRIN CLEMENT, an individual:
14  and DOES 1- 40 inclusive.
15
16             Plaintiffs.
17     vs.
18
19  BERNT WAHL, an individual:
20  FACTLE, a California corporation
21  and DOES 1- 20 inclusive.
22
23             Defendants.

Case Number: 3:07-cv-5777, C-07-5777BZ

**RELEIF FROM CLAIMS AND ASSERTED DAMAGES OF COPYRIGHT INFRINGMENT; REMOVAL OR ALTERATION OF COPYRIGHT MANAGEMENT INFORMATION**

24
25  Defendant Bernt Wahl ("Factle" or "Defendant(s)") requests a stay of **CLERK'S Notice for ENTRY OF**
26  **DEFAULT Against Defendants Bernt Wahl & Factle (tn, COURT STAFF) (Filed on 1/31/2008)**
27  since the Defendants were not: served with any documents, notified of any hearing, provided with any
28  trial dates or given a chance to respond to the pending case 3:07-cv-5777. On February 7, 2008,
29  Defendant(s) learned of a **CLERK'S Notice for ENTRY OF DEFAULT** for a prior unknown 'event'
30  assumed to be a hearing. On inspection, Defendant(s) have now has learned that most likely scenario for

1  document service was to a woman described as "Jane Doe", 5'3" in height with blue eyes. A second set
2  was supposedly sent to a non-existent address - 1911 Martin L. King Jr. Way #3 in Berkeley, CA, 94704.
3
4  Additionally Defendant(s) request relief from unwarranted allegations and request dismissal of charges
5  brought against the Defendants for allegations including alleged copyright infringement and other items
6  used to conduct the firm's operations. Defendant(s) have never had any business contracts with
7  Maponics/Darren Clements. Both parties Plaintiffs and Defendants (primary author) had been co-
8  licensees of the original HomeGain "neighborhood boundary layer" until Plaintiff purchased HomeGain
9  data and then tried to restrict Defendants use. What Plaintiffs -- it is presumed -- did not realize is that a
10 higher level quality data set had already been created at a GDT level of exactness. The GDT level project
11 was created by experts in the field of GIS independent of HomeGain. HomeGain and then Microsoft were
12 fully aware of the project and later HomeGain offered to fund continued development of it but it was
13 turned down by the developers. After a demonstration of the GDT level data set was shown at HomeGain,
14 some at HomeGain were interested in licensing the GDT level quality data. Coincidently it was around
15 that time when HomeGain sold its (less precise) TIGER quality 'Neighborhood Mapping Layer' data to
16 Maponics.

17                              **NATURE OF CASE.**
18  1. Defendant claims that no copyright infringement ever existed, and that the Plaintiff has over
19     stepped his bounds in exerting rights of a stated 'copyrighted' work. The arguments for non-
20     infringement are as follows:
21     a. The Defendant(s) retains license rights to use, display, post, any and all "neighborhood
22        boundary layer" work for a period of 23-years that expires in 2030 from the initial
23        neighborhood data provider HomeGain, see (exhibit 1. Contract and Letter).
24     b. The 'copyrighted' data set was never used as far as can be recalled by Factle for public
25        display, (and in fact the supposed author Bernt Wahl was not aware if its existence in a

2

period that a similar size set/structured se was posted on an obscure portion of a Factle's website, a list based on the ranking cities or states in order of population to available data of roughly 200 cities, thought in November 2007 it was replaced with a considerably larger list with over 450 + cities. Other sources such as Zillow and Urban Mapping have similar neighborhood data sets to HomeGain's original data set based on assumed similar ranking criteria. These lists are generally created by a dynamic process based on the number of cities collected from public domain sources would infringe on a copyright. [PROCD, INCORPORATED, Plaintiff-Appellant, v. MATTHEW ZEEIDENBERG and SILKEN MOUNTAIN WEB SERVICE, INC., Defendants-Appellees. UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT].

c. It is doubtful that this type of data's copyright is enforceable, due to the fact that it is based on US Census Data and other publicly available information based on a common algorithm based on ranking cities by size. Phone books use a similar process to collect data by sorting phone numbers by alphabetical names (a non- copyrightable collection).[FEIST PUBLICATIONS, INC. v. RURAL TELEPHONE SERVICE CO., INC. No. 89-1909  SURPEME COURT OF THE UNITED STATES January 9, 1991, Argued, March 27, 1991 Decided.]

d. If any intellectual elements exist it in the neighborhood data collection foundation work, it would most likely be retained by the author (Bernt Wahl) who's work on neighborhood creation methodology is published in: Exploring Fractals (1995) see sample portion exhibit 2. , African Fractals (1999), with ideas mention in West Contra Costa Times (WYP) article (1995), One World Many Places Project /Our World My Place (1995) which laid out the structures of location which neighborhoods constituted a subset and with the companies where confidential local search work was done: Dynamic Software (1994), RQ Labs (1998), YellowGiant (2000), InfoSeek/Disney (2000), InfoSeek BO (2001), and MMU research work (2002) later called Factle (2004). While local

| | |
|---|---|
| 1 | search/neighborhood technology was shared with HomeGain by Bernt Wahl in aiding |
| 2 | SEO, disclosed prior technology the content is to remain confidential and the disclosed |
| 3 | material/ideas are only for HomeGain's or for Defendant's affiliate site's use. It is |
| 4 | believed that HomeGain has not breach that confidentiality to others, but the Defendant |
| 5 | would like to subpoena the materials transferred to Maponics to verify this to be true if |
| 6 | the case proceeds. Since a majority of HomeGain's neighborhood materials were created |
| 7 | and/or inspired by Defendant's prior research work or his work with other companies |
| 8 | prior to HomeGain's neighborhood project -- the project was known "as your |
| 9 | neighborhood idea" referring to the Defendant's ideas and no significant conceptual |
| 10 | contributions were made afterwards, the material confidentiality should not be an issue in |
| 11 | the subpoena. [CLIFFORD SCOTT AYMES, Plaintiff-Appellant, v. JONATHAN |
| 12 | BONELLI, doing business as Island Swimming Sales, Inc.; and ISLAND |
| 13 | RECREATIONAL, Defendants-Appelles. Docket No. 92-7098, UNITED STATES |
| 14 | COURT OF APPEALS FOR THE SECOND CIRCUIT, September 14, 1992, Argued, |
| 15 | December 2, 1992, Decided.], [WEXLER v. GREENBERG, Apellant. THE SUPREME |
| 16 | COURT PENNSYLVANIA, Agued November 19, 1959. May 4, 1960]. |

  e. Documentation by Plaintiff that author authorized and then relinquished copyright to said 'copyrighted' work.

### JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT.

2. The Defendant argues that case was filed in an inappropriate court jurisdiction based on a highly overstated "neighborhood data" value and alleged damages that are "greatly" excess of any realistic value, thus enabling the Plaintiff the ability to reap an excessive amount of damages. Evidence to excessive stated value claim:

   a. The entire 'Neighborhood Mapping Layer' with names (ownership and distribution rights) were purchased from HomeGain for $40,000 in May 2007 (see page 17 of C-07-

1   5777BZ Document 1) well under the $75,000 eligibility requirement. The value of the

2   location name asset in question constitutes less than 10% of the complete 'Neighborhood

3   Mapping Layer' purchased asset value based on Maponics data licensing structure (see

4   exhibit 3. below). Of the city data cited, that disputed copyrighted data comprises less

5   than 2% (~200/10,000 +) of the total location names.

6   **Exhibit 3.**

7   **Under $10K - Neighborhood Boundaries**

8   **Under $5K - Neighborhood Location Centers**

9   **Under $1K - Neighborhood Names**

10  **Under $1K - Neighborhood to ZIP Look Up**

11  **Cited:** http://www.maponics.com/Neighborhood_Boundaries/neighborhood_boundaries.html

12    b.  The highest price ever charged by HomeGain (based on Bernt Wahl's recollection) for

13        the complete rights to utilize the 'Neighborhood Boundaries and Names' was $5,000 for

14        a 5-year license. Even then, it was a hard sell and only 5 licenses were sold - one license

15        was to Maponics.

16  3.  Maponics sells/licenses the neighborhood name data for "**Under $1K - Neighborhood Names**"

17      (from Maponics web site -2008) how can they claim that use of 2% of that data use constitutes a

18      value of over $75,000 .

19  4.  The only public place that can be conceived of that a data set of city names could have been

20      posted similar to the claimed "copyright" set of about 200 cites would have been on an obscure

21      section of the Defendant's website. It is estimated that there were around 50 visits total to that

22      area of which an approximate number of at least eight visits came from Maponics/Darrin

23      Clement. That section was updated to a new data set in November 2007 and now constitutes over

24      450 cities. If Defendants had not secured the flat fee license from HomeGain that they did, and

1     data was assessed that the standard $0.02 - $0.00.1 per use, the licensing fee for map data that

2     would total about $1.00, far below the $75,000 minimum damages required.

3  5. That Factle is being singled out for supposed similar copyright infringement for potentially a total

4     of roughly 50 page views, where others sites with almost exactly the same license as Factle has,

5     that use the exact HomeGain list of cities and neighborhoods with millions of viewers each

6     month shown for over 4-years might seem strange. It may appear to some that these actions are

7     being taken to prevent competition in the area of neighborhood map data creation (an anti-trust

8     issue), rather than to recover any real economic damages.

## FIRST CAUSE OF ACTION.

**(Relief from Deceptive and Malicious Actions Against Defendants)**

11  **6.** The Defendant(s) ask that evidence be provided for any statements and allegations brought

12     against the Defendant(s). Accusations have been made seem to be unsubstantiated and are often

13     appear to be without merit.

## SECOND CAUSE OF ACTION.

**(Unfair Competition Monopolistic Practices)**

16  7. That false or misleading statements made by Darrin Clement or Maponics members, about any

17     Defendant(s), their work, their rights or their character made in a public forum or in private

18     communication be rescinded and that just compensation be made for loss of potential income or

19     harm to reputation in the amount to be proven at trial.

20  8. The Plaintiffs continuing actions are causing the Defendants irreparable harm and that the

21     Plaintiffs are awarded relief from such actions by the Court.

22  9. That the court allows reciprocated claims and actions used by the Plaintiff(s), to be used by the

23     Defendant(s) where applicable.

**PRAYER**

Wherefore, the Defendant(s) pray for relief and that a judgment is entered against each Plaintiff as follows:

1. That Plaintiffs including all their shareholders, investors, employees, all those holding a vested interest, agents, representatives, and all persons acting in concert or in any other fashion allied with Maponics be held financially liable and to account for any and all false or misleading statements made about the Defendants whether it be in falsely depriving economic opportunity or in defamation of character.

2. That Plaintiffs including all their shareholders, investors, employees, all those holding a vested interest, agents, representatives, and all persons acting in concert or in any other fashion allied with Maponics be held financially liable for knowingly or unknowing creating false statements and ambiguity in the market on Factle's rights to generate, produce and sell map or other data.

3. That Plaintiffs including all their shareholders, investors, employees, all those holding a vested interest, agents, representatives, and all persons acting in concert or in any other fashion allied with Maponics make restitution to Defendant(s) if found to hold or contain proprietary information, intellectual property or data that is held in ownership or by authority to Plaintiffs.

4. That Plaintiffs including all their shareholders, investors, employees, all those holding a vested interest, agents, representatives, and all persons acting in concert or in any other fashion allied with Maponics be required to pay for damages sustained (both economic and to reputation of character) for actions and activities complained of herein in an amount proven in court or trial.

5. That Plaintiffs are required to identify all contacts, discussions and postings in which Defendants and/or their work was mentioned or referred to gauge the extent of damages produced by Plaintiffs false or misleading statements.

6. That Plaintiffs are required to make a public declaration to the extent of false statements, misleading statements and the ambiguity in the market that was made by defendants on Factle's

      rights to generate data, distribute content, purchase data, sell maps or produce related map data; stated damages of herein will in an amount proven in court or trial.

7. That Plaintiffs including all their shareholders, investors, employees, all those holding a vested interest, agents, representatives, and all persons acting in concert or in any other fashion allied with Maponics be held liable for any anti-trust or racketeering charges in trying to monopolize the 'neighborhood map' market assessed with punitive damages of herein in an amount proven in court or trial.

8. That Plaintiffs are required to make full restitution for violations of California Business and Professions Code [SECTIONS 17200-17203]

9. That Plaintiffs are required to pay Defendants costs and reasonable attorney's fees as authorized by law.

10. That Plaintiffs be required to pay prejudgment interest from the date of infringement or damaging event and for postjudgment interest as allowed by law.

11. That Plaintiffs be required to pay punitive damages: as well

12. Other such damages and further relief as the Court deems reasonable and proper.

Dated: February 10, 2008

    Respectfully Submitted,

    By: *Bernt Wahl*

    Bernt Wahl
    Defendant

## USAGE AGREEMENT

This Usage Agreement (the "**Agreement**") is entered into this 25 day of July 2007, (the "**Effective Date**") by and between Factle Map Company ("**Factle**") and _Factle_ ("**User**").

WHEREAS, Factle Map Company desires to promote and expand the customer base for its Neighborhood Mapping Products and

WHEREAS, the parties desire to enter into an agreement to allow User to use the Neighborhood Mapping Data pursuant to the terms set out in this Agreement.

NOW, THEREFORE, the parties to this Agreement agree as follows:

1. **LICENSE:**

1.1 Subject to the terms and conditions of this Agreement, Factle hereby grants to User a non-exclusive, non-transferable license within the United States of America to possess and to use Licensed Materials, as defined in Schedule A, subject to the terms and conditions hereof.

User shall have the right to reuse the Licensed Materials, as follows: User will use data commercially for Users internal purposes and/or for User's own properties and services. User shall provide a list of any publicly viewed 'Factle Neighborhood' information (e.g. website) to Factle via email. Such notification shall be sent to factles@gmail.com. Factle shall review such publicly shown information within 10 business days of posting. In the event that another party is found in usage of Factle's data acquired from User directly (intentionally or unintentionally), User shall cease Factle data presentation activity for public viewing until reasonable efforts have been put in place to prevent 3rd party data acquisition. Factle shall be under no obligation to refund any cost for data or its use restriction.

1.2 Payment: The Licensed Materials shall be only used by User directly for use by end-user only, using contractual terms as may be defined and agreed upon by User and Factle. Users will be strictly prohibited from resale or redistribution of the original Licensed Materials. User shall pay to Factle the full amount for Licensed Term period (unless an agreed upon installment has been authorized) for the Licensed Materials.

2. **TERM:**

2.1 The "**Term**" of this Agreement shall be set forth in the contract which term shall commence on the Effective Date. The Licensed Term period is from the Effective Date until January 1st, 2030.

3. **MISCELLANEOUS:**

3.1 Neither party shall use any trademark, service mark, logo or other proprietary identifying symbols of the other without the other party's prior written consent.

3.2 Neither party may assign this Agreement without the prior written consent of the other, not to be unreasonably withheld.

3.3 The rights and remedies set forth herein are intended to be cumulative, and the exercise of any one right or remedy by either party shall not preclude or waive its exercise of any other rights or remedies hereunder or pursuant to law or equity.

3.4 If either party brings any legal action to enforce the terms of this Agreement or declare rights hereunder, the prevailing party in any such action, on trial or appeal, shall be entitled to its costs and expenses incurred, together with reasonable attorneys' fees to be paid by the losing party, as fixed by the Court or arbitrator.

3.5 This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without reference to conflict of law principles.

3.6 If any provision of this Agreement, or the applicability of such provision to any person or circumstance, shall be determined to be invalid by any court of competent jurisdiction, such determination shall not affect any other provision of this Agreement, all of which provisions shall remain in effect.

3.7 Failure of either party to enforce, at any time, any provision of this Agreement, or to exercise any right herein provided, shall not in any way be construed to be a waiver of such provision or right with respect to any such (or subsequent) event, breach or default, and shall not in any way affect the validity of this Agreement, or any part thereof, or limit, prevent or impair the right of such party to then (or thereafter) enforce such provision or exercise such right.

3.8 All notices in connection with this Agreement shall be in writing and shall be delivered by hand or fax, email with conformation, or sent by first class mail, postage prepaid, or a nationally recognized overnight delivery service (such as FedEx) to such addresses (or facsimile numbers) as from time to time are designated by either party. Any notice faxed or personally delivered shall be deemed given and received on the date of the fax confirmation or, for personal delivery, the date of delivery or refusal. Any notice given by first class mail shall be deemed given upon the third business day following deposit of such notice with the U.S. Postal Service. Any notice sent by overnight delivery service shall be deemed given upon the day following deposit of such notice with the overnight delivery service.

3.9 It is expressly understood and acknowledged that it is not the intention or purpose of this Agreement to create, nor shall the same be construed as creating, any type of partnership, relationship or joint venture between the parties, and neither party shall have the authority to commit or bind the other party to the performance of any obligation.

3.10 Nothing in this Agreement shall be construed as creating or giving rise to any rights in any third parties or any persons or entities other than the parties to this Agreement.

3.11 Each party will perform its obligations under this Agreement in strict compliance with all applicable laws, orders or regulations of all appropriate jurisdictions.

3.12 As used in this Agreement, "Confidential Information" means (a) proprietary or trade secret information which is clearly labeled or designated in writing as confidential, proprietary or the like by the disclosing party, (b) information disclosed orally with a designation of such information as secret, confidential or proprietary prior to or during the oral disclosure and a subsequent reduction of such information to a writing labeled confidential, proprietary or the like and sent to the party to whom the disclosure was made within 15 days after the oral disclosure and (c) the provisions of this Agreement. Information shall not be considered Confidential Information to the extent that such information is: (w) already known to the receiving party free of any restriction at the time it is obtained from the other party; (x) subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (y) or becomes publicly available through no wrongful act of the receiving party; or (z) required to be disclosed by applicable law. Each party agrees that it will not, during the term of this Agreement and for two years thereafter, disclose to any other person or entity any Confidential Information received from the other, except (a) to the extent necessary or desirable to perform under this Agreement, (b) in connection with any pending action related to this Agreement, or (c) as required by a court of competent jurisdiction. Notwithstanding the provisions of this Section 3.12, the parties may disclose Confidential Information to their respective affiliates, accountants, attorneys, and other similar professional advisors as long as the entity to which Confidential Information is disclosed is subject to obligations of confidentiality with the same effect as those specified in this Section 3.12.

3.13 This Agreement constitutes the entire agreement between the parties, and supersedes all previous negotiations, commitments and writings, and may not be changed or modified in any manner except by an instrument in writing signed by a duly authorized representative of both parties.

**[INENTIONALLY BLANK]**

IN WITNESS WHEREOF, this Agreement has been executed as of the day and year first above written.

| Factle Co. | User: |
|---|---|
| By: *Bernt Wahl* | By: *Roy C Raj* |
| Name: Bernt Wahl | Name: ROY RAJAN |
| Title: CEO | Title: CFO - FACTLE MAPS |

The terms of this Agreement are Confidential.    4

**Exhibit (Schedule A)**

"Licensed Materials" means the neighborhoods data owned or developed by Factle or its distribution partners (specifically including HomeGain). Specifically, this includes the names and boundaries of neighborhoods and sub-neighborhoods as well as their association with their cities and states and demographic data.

OFFERINGS IN WHICH LICENSED MATERIALS MAY BE USED:

<u>Displaying neighborhood names on a company's mapping products</u>
<u>Displaying neighborhood boundaries on a company's mapping products</u>
<u>Using neighborhood boundaries for back-end data analysis</u>
<u>Providing neighborhood boundary data in standard GIS (geographic information system) format</u>

Specifically:
Offering A: Static digital maps (e.g. PDF maps, TIFF images, etc.)
Offering B: Printed maps
Offering C: Interactive maps
Offering D: Data analysis and reports (for example, tagging an End User's address database with a neighborhood field)
Offering E: Resale of Licensed Materials

<u>The data may not be redistributed.</u>

Price: $ _250_ Neighborhood Boundaries and $ _____ Neighborhood Demographic Data including conversion of raw data files into industry standard formats, including ESRI Shape, MapInfo Tab, and Google KML.

Specifically:

Offering A: Neighborhood Demographic Data $ _____
Offering B: Top 150 City Neighborhood Name and Boundary Data $ _250_

**ALL DATA is Licensed "AS IS" with no warranty given (expressed or implied). Factle Co. and its partners will not be liable for any 'errors' or other 'events' seen or unforeseen arising from use of licensed 'materials'. Data Material use is at the discretion of User, who is held liable for its use.**

**Factle Co. plans to make improvements and updates, as the firm deems necessary. Updates to existing data will be provided for free or at a nominal charge as it becomes available for its licensees. Data for expanded coverage will be considered additional data requiring a separate agreement.**

15

**HomeGain shall review such lead information against its existing customer list and list of existing leads that are actively being pursued by HomeGain, and shall notify Factle Co. in writing of any duplications within ten (10) business days of its receipt of such written lead information from Factle Co. In the event of any duplication notification by HomeGain within the 10-day period, the licensee's money shall be promptly returned (10-days).**